IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

TERRY C. BRUNNER,
Plaintiff,
-vs- No. 98-554C
THE UNITED STATES,
Defendant.

---

Deposition of TERRY C. BRUNNER, held before Audrey Minkel, Notary Public, at 138 Delaware Avenue, Fourth Floor Conference Room, Buffalo, New York, on Tuesday, June 27, 2000 at 10:50 a.m., pursuant to notice.

APPEARANCES: GUSTAFSON & ROHRER
BY: GALE R. GUSTAFSON, ESQ.,
400 South Main Street, Suite 101
Conrad, Montana 59425
(406)278-7521
Attorneys for the Plaintiff
(Appearing via telephone)

DAVID W. OGDEN, ACTING ASSISTANT ATTORNEY GENERAL
BY: MARK L. JOSEPHS, TRIAL ATTORNEY
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202)307-6288
Attorneys for the Defendant





ALSO PRESENT: RICHARD A. MEDEMA, ESQ.,
Of Counsel
Drug Enforcement Administration
Office of Chief Counsel
700 Army-Navy Drive
Arlington, Virginia 22202
(Appearing via telephone)





MR. JOSEPHS: Why don't we go on the record. Are we doing the deposition or not?

MR. GUSTAFSON: Well, that will be determined here but we're going to go on the record.

MR. JOSEPHS: Why don't we start before you swear the witness. Go ahead.

MR. GUSTAFSON: Okay, let the record reflect I guess this is the time and date that Mr. Josephs, on behalf of the Department of Justice, has scheduled the deposition of Terry C. Brunner in the case before the United States Court of Federal Claims, Terry C. Brunner, Plaintiff, versus United States, Defendant, Case 98-554C.

Let the record also reflect that the Plaintiff has pursued discovery via interrogatories and deposition in this case of the Department of Justice for the Drug Enforcement Administration as represented by the Department of Justice dating back to August of 1998, and that Plaintiff generously extended generous additional time to the Department of Justice to respond to the interrogatories and request to the Plaintiff allowed the Defendant, the United States of





America, represented by the Department of Justice, an additional 47 days to respond to the Plaintiff's interrogatories and request to produce, and upon receiving those responses the Plaintiff's attorney felt that the responses were something that could have been put together, thrown together within 10, 15 days at the most, certainly didn't require 77 days.

The responses were generally evasive and nonresponsive, that counsel for the Plaintiff has advised Mark Josephs of the Department of Justice of his disappointment with this department's failure to abide by what he considers the letter and spirit of the rules of discovery and has followed that up with a letter here most recently on May 10, 19 -- or 2000, requesting again in detail his setting forth his dissatisfaction with those, the Defendant's responses to those interrogatories and request to produce, and asking that they be supplemented.

This letter of May 10 was faxed to Mark Josephs on that same date, although the hard copy which was sent certified mail return receipt





154-98-554-04

way back from California, they asked me if I would consider going out to Nevada and working there because I had an occasion to meet some of their agents from out there due to the fact that two of the city cops that went up to Nevada with us up and left in the middle of the night in Great Falls leaving us very shorthanded out there for surveillance and security on me and what have you.

Now, when I went out West, I used my own cash to go out there, I was never reimbursed for it. I had not a falling out, but when I met with the two agents out there from DEA, the one kept going to his side and I asked him, I says, "are you recording this?" and he took off his pager and literally threw it at me. I have his name also, that I would have to listen to my tape.

Ben was upset because I come back and at one point they caught me with three grams of marijuana and a gun when we were going out trying to make a buy of cocaine, I forgot it was in my truck. The gun was legal, it was given back to me and I was never charged. Ben, that was a







falling out between coming back from Nevada and raising hell about the case that we lost to the state on Dave Atkins. When them two boys left Nevada, they come back to Montana, ripped me off one of my cases, and DEA, that was one we were supposed to do as a task force and they ended up doing on their own.

Q. Now, you said that you had a gun and marijuana in your truck, did you say?
A. Yes, truck.
Q. When was that?
A. That was the end of October I think it was, yes.
Q. And were you charged with marijuana possession?
A. No.
Q. And you said that the gun was registered?
A. Yeah, it was a legal gun.
Q. When you say, "legal gun," what do you mean?
A. It was a legal gun, you can carry it in Montana as long as it's in the glove compartment. It was in a locked case in the glove compartment, the case that it came in, fully legal. They had to give it back to me.
Q. Was it registered in any way?







A. I don't believe they had gun registration out there at that time. I don't know what gun registration is other than when you go buy one you have to sign an ATF form, if that's what you are talking about.
Q. And when you bought the gun, did you sign that form?
A. Yes, and that gun also was fully legal in the State of Montana for me to have.
Q. Now, when you were -- strike that. Did anyone with the DEA ever tell you that when acting as a cooperating individual you couldn't participate in acts of violence?
A. Acts of violence, yeah.
Q. And did anyone tell you that you couldn't use unlawful techniques to obtain information for the DEA?
A. Yes.
Q. And were you told that you couldn't initiate a plan to commit criminal acts?
A. A plan to commit, well, that's what they were asking me to do.
Q. Okay, but, well --







A. You know, you're asking me to bring you intelligence on criminal activity.
Q. Okay. How about this, did anyone ever tell you that you couldn't participate in criminal activity as a person under investigation unless the DEA said you could?
A. Yes.
Q. Did you understand you were not an employee of the DEA?
A. I understood that.
Q. And that you were not an undercover agent of the DEA?
A. Exactly, I was a cooperating individual or as I was known up North as a hired gun when I was in front of judges on testimony.
Q. And did you understand that you had to keep your participation as a cooperating individual confidential?

MR. GUSTAFSON: I have been tolerating I guess a number of -- excuse me, what was that question?

MR. JOSEPHS: I was asking if he understood that he was to keep his participation with the

DEA as a cooperating individual confidential.
A. Yes.
Q. Did you understand that any payments made to you by the DEA for services as a cooperating individual were to be reported to the IRS as income?
A. They never told me no such thing. First of all, I haven't gotten any income from DEA, I got a thousand dollars for three months, I got $2,000 total not taxable. Number one, what I am fighting for now, if I did get any of it I would pay taxes on it but what was done, why should I pay taxes on money spent for expenses for DEA.
Q. Well, when you say that the $2,000 were not taxable, what's the basis for that?
A. Well, first off, that only a thousand went to my family to support them, the other thousand was for out on the street, working capital out on the street.
Q. Again what's the basis for saying it's not taxable?
A. $2,000 income for a year, it's not taxable.
Q. So you're saying you did not have to report that







to the IRS?
A. No, I was never told to.
MR. GUSTAFSON: I think it's quite clear that you didn't meet the income threshold.
MR. JOSEPHS: Mr. Gustafson, we really don't need your testimony here.
MR. GUSTAFSON: You're asking him to make legal conclusions. I don't know that's a proper question to ask.
MR. JOSEPHS: You can object on that basis but you can't help him with the answer.
MR. GUSTAFSON: My objection is so noted but you're asking the witness to make a legal -- to make a legal conclusion and I indicated what I believe to be the basis of that. You seem to have difficulty grasping that.
BY MR. JOSEPHS:
Q. All right. You said that you signed a cooperating individual agreement. I think you said that before, you signed the cooperating individual agreement?
A. Uh-huh.
MR. JOSEPHS: I'm going to have the court







reporter mark Plaintiff's Exhibit A to the complaint as Exhibit 1 to your deposition.
MR. GUSTAFSON: I would object to the introduction of that document as an exhibit of this deposition because it's not a clean unedited agreement. If you have one, I would certainly stipulate to the introduction of that.
MR. JOSEPHS: I'm not asking you to stipulate. Are you saying I'm not allowed to introduce this to the deposition, something attached to your complaint?
MR. GUSTAFSON: I guess my objection, it's not the best evidence. You have one on file that is unedited.
MR. JOSEPHS: I'm introducing this one with the --
MR. GUSTAFSON: I'm asking you if you will substitute it without the other obliterations or deletions.
MR. JOSEPHS: Those are protected by privileges and I'm introducing this as Exhibit 1 to the deposition. If you have an objection, you should so state.







MR. GUSTAFSON: Would you please state for the record your privilege you are stating as to why the witnesses to that agreement are obliterated.
MR. JOSEPHS: That is investigatory files privilege, it's a criminal investigation privilege that's well documented, well stated in the case law.
MR. GUSTAFSON: Why are you asking him who witnessed that agreement if it's privileged?
MR. JOSEPHS: I'm not asking him who witnessed that agreement, I'm just simply -- I haven't even asked any questions about the agreement yet.
MR. GUSTAFSON: I'm just saying I object to it. It's not the best evidence because it's been obliterated. The copy appended to the complaint, it's a copy I obtained through the Freedom of Information Act.
MR. JOSEPHS: I'm going to ask him information about the text that can be seen on there.
MR. GUSTAFSON: Okay.

The following was marked for identification:
Defendant's Exhibit No. 1 Cooperating

individual agreement
Q. I'm handing you what's been marked as Defendant's Exhibit 1 which is a copy of Plaintiff's Exhibit A to the complaint. Do you recognize that document?
A. Yeah.
Q. And what is it?
A. That's a cooperating individual agreement.
Q. And do you know who drafted this?
A. Do I know who drafted it, all it says, "U.S. Department of Justice and Drug Enforcement Administration." If you are asking who signed it along with me --
Q. I'm just asking if you knew who drafted the text that we can see here.
A. Yes, U.S. Department of Justice.
Q. What was your understanding of what this document meant?
A. What does it mean?
Q. Yes.
A. You don't break the law with them, any information you got you can't make no lies up about it and I didn't do any of that. As far as I







understand it, I just -- purely understanding you're not supposed to break the law or doing anything out of hand.
Q. Is there any reference to payment in this document?
A. No, there's not.
Q. Did you sign any other documents as part of your services as a cooperating individual with the DEA?
A. No.
Q. Now --
A. You won't get one of them, Mark, you will not get one. I can bring ATF agents forward to tell you that, you know, that anybody that works with this government thing knows that, that's so they can't be brought into court like we are right now so our government can take a person like me and use them, get done with them and throw them away when they're done with them and forget about them, they got what they needed out of them. That's exactly what was done to me on more than one occasion with our own U.S. government.
Q. Okay. Now, from August 1992 through November







1992, did you receive payments and reimbursements from the DEA of just over $13,000?
A. I don't know the exact figure. If that's what it says, that's what it is.
Q. Why don't I go ahead and show you the exhibit to the complaint.
MR. GUSTAFSON: What exhibit are you showing the Plaintiff?
MR. JOSEPHS: Just a second.
THE WITNESS: Payments, 13,529.95 is what I got.
MR. JOSEPHS: I'm going to have the court reporter mark as Exhibit 2 to the deposition Exhibit C to the complaint which has two pages of lists of payments, then has a number of vouchers attached to it.
MR. GUSTAFSON: My objection is the same as to this exhibit, it's not the best evidence. The vouchers that are appended to it are vouchers that were furnished me pursuant to the Freedom of Information request with a number of items obliterated. My feeling is the original of these copies or at least unedited copies of the







original should be substituted for this exhibit, Defendant's Exhibit 2 to this deposition as the best evidence. Noticeable things again are obliterated such as the authorized representative DEA who approved or authorized payment of either salary or expenses or rewards to Mr. Brunner.

The following was marked for identification:
Defendant's Exhibit No. 2 DEA payments to Terry C. Brunner
Q. I'm just going to put the marked exhibit in front of you which is the same --
A. Same thing as what I have.
Q. -- as Exhibit C to the complaint. What are the first two pages of this document?
A. The payments from DEA.
Q. And do you know who drafted these two pages?
A. I'm not sure who drafted them, I'm not sure. I imagine off of this stuff here, off the receipts as they do run together.
Q. Do these two pages fairly represent what you were paid by the DEA?
A. Not what I was paid, not what I was paid, that's

understanding of what is meant by, "at the conclusion of Mr. Brunner's testimony"?
A. At the end of my testimony; if I'm needed to go testify I'll go testify.
Q. For what?
A. Well, to prosecute the man.
Q. To prosecute who?
A. Well, evidently they're talking about this guy from the other exhibits here. I mean, it doesn't take a --
Q. What guy?
A. Mike Goat.
Q. When you say evidently that's who they're talking about, what's the basis for that?
A. I'll show you the basis here in a minute.
MR. GUSTAFSON: Are you entering this as an exhibit?
MR. JOSEPHS: Yes, I did, as Exhibit 3.
THE WITNESS: Well, it doesn't say in this letter that you are talking about but it does refer back to here.
Q. Where?
A. It doesn't on here, but why would he say at the





conclusion of his testimony he would be paid $2,000 when they stated it back at this part here.
Q. Can you tell me which voucher you're referring to.
A. Okay, it will be the voucher marked 11/23, it says, "payment to CI for expenses incurred. CI will be paid in full $2,000 at end/close of this case;" and I believe that's what he's regarding to here which was Mike Goat's case or Mike Goat Snider's case.
Q. What's your basis for saying this case on the voucher refers to Michael Goat Snider's case?
A. Because they advanced me $500 off of it of the $2,500 which was paid on 11/23 right here, "payment to CI for expenses incurred will be paid in full $2,000 at the end/close of this case," which is the Michael Snider case. I know that, they know that. You don't understand it.
Q. And again what's your basis for knowing that?
A. Well, what they've told me.
Q. Who told you?
A. Well, when they gave me the $500 advances.





Q. And who told you that?
A. That would have been Ben -- Wes Hearon.
Q. Did you in fact testify at any time when acting as a cooperating individual of the DEA?
A. Yes, I went to Grand Jury.
Q. When was that?
A. January of -- that was expensive to go down there, too, DEA wouldn't even give me expense money to go to Billings so their voucher wouldn't be in here. What do you want to know, the dates of the Grand Jury? I don't remember.
Q. Just generally you said January, could it have been January '94?
A. Could have been, could have been.
Q. So you testified in the Grand Jury?
A. In Billings, Montana, I testified and I turned in evidence of our whole trip from Great Falls to Carson City and then onward to LA, which Goat took himself, him and a girl with him and I waited in Stagecoach, Nevada, at the Baron's Motorcycle Clubhouse for a period, then I stayed up in Carson, yes, Carson City with Wes Hearon, different motels but in the same city. It was





the only way they can keep me secure.
Q. So you testified in the Grand Jury once on one day?
A. One day.
Q. Were you asked to testify at the trial of Gary Lee Roberson?
A. Sure, it was Tiny, yes, sure was.
Q. And did you in fact testify?
A. No.
Q. Why not?
A. Well, seeing I've gotten screwed around by the DEA in the past on that same case, I asked them to send me a round-trip air ticket. They would not do it, they wouldn't give me no security, they wouldn't get me any security from the airport to a motel, they wanted me to fork this out of my pocket. I'm not going to do it, they never paid my moving expenses and why should I trust them.
Q. Where was the trial of Gary Lee Roberson?
A. It was in Great Falls, Montana, and I had made arrangements there to drive my own car there. I was served -- I wasn't served, it came in the

mail, which is illegal because it's in another country, you don't serve a summons like that.
Q. Where were you living at the time?
A. I was living at Fort Erie, Ontario, Canada. They have to go through proper protocol out of Toronto and he did not do that and I had told them at one time they wanted me to come there and I said all right, I'll drive myself, that's the only possible way I could have afforded it and then I had the security of my own vehicle to get and go if I have to do what I have to. I took time off, I was working at General Motors at the time, I took time off of work. They turned around and they canceled it, they said they didn't need me only to reschedule it another time and at that time there it was not possible for me to go.
Q. And why wasn't it possible?
A. Why wasn't it possible, because I had been sick.
MR. JOSEPHS: Okay, why don't we go off the record and take a 10-minute break and then I don't have very much more at all.
(Recess taken.)
MR. JOSEPHS: Back on the record.







BY MR. JOSEPHS:
Q. Mr. Brunner, I may have asked you this before but did you disclose your activities as a cooperating individual to any other persons?
A. Any other person, the attorney.
Q. Okay. Outside your attorney and the DEA government people, did you disclose to anybody?
A. Not to my knowledge. My wife, you know.
Q. Anyone else?
A. Unless she run her mouth.
Q. Excuse me?
A. Unless she ran her mouth, which she was good at.
Q. You don't remember telling anyone else?
A. No, I sure don't other than not DEA but ATF and them involved with it, not to my knowledge, anyway.
Q. And was it your understanding that you were to be on active status as a cooperating individual as long as the DEA deemed you to be satisfactory, deemed your activities to be satisfactory?
A. Yes.
Q. And you talked about the possession of the gun in your I think you said truck or was it a van?







A. Truck.
Q. And marijuana. Did the DEA approve you carrying a gun or holding marijuana?
A. They didn't approve of a gun going out on a -- that was supposed to be a buy that night and I wasn't going to take my truck and instead of taking -- I had another individual from Montana, Montana Bureau of Narcotics investigation and instead we took mine at which time I forgot that stuff was even in there. I knew the gun was but I didn't think it would be a problem because it was locked up.
Q. What about the marijuana, did the DEA approve?
A. It wasn't legal, I know it was not legal but that's part of being around when you're eating and living 24/7, sometimes stuff like that gets left in your vehicle without you being aware of it.
Q. So again the DEA did not approve you having marijuana in the truck?
A. No, not in the truck.
MR. JOSEPHS: If I can just show you, I'm going to have the court reporter mark Plaintiff's







Exhibit B to Plaintiff's complaint, if you can mark that as Exhibit No. 4.

The following was marked for identification:
Defendant's Exhibit No. 4 Summary of criminal asset forfeiture proceedings
Q. Mr. Brunner, do you recognize that document?
A. Yes, sir.
Q. And what is it?
MR. GUSTAFSON: Can I make a comment here? I would have an objection again, this is not the best evidence that the assets seized which the Plaintiff is claiming credit for in terms of indictments and conviction, this is a product of legal counsel for the Plaintiff, namely myself, Gale Gustafson, based on information furnished me by the U.S. Marshal's Office and District Court Clerk in Great Falls and it does not list or include anywhere assets or moneys seized from the last defendant which is the OCDETF case, Michael Goat Snider, and my feeling is that this Drug Enforcement Administration Department of Justice would have the best evidence of the moneys