IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------------------

TERRY C. BRUNNER,

Plaintiff,

-vs- No. 98-554C

THE UNITED STATES,

Defendant.

---------------------------------------------

Deposition of TERRY C. BRUNNER, held before Audrey Minkel, Notary Public, at 138 Delaware Avenue, Fourth Floor Conference Room, Buffalo, New York, on Tuesday, June 27, 2000 at 10:50 a.m., pursuant to notice.

APPEARANCES: GUSTAFSON & ROHRER
BY: GALE R. GUSTAFSON, ESQ.,
400 South Main Street, Suite 101
Conrad, Montana 59425
(406)278-7521
Attorneys for the Plaintiff
(Appearing via telephone)

DAVID W. OGDEN, ACTING ASSISTANT ATTORNEY GENERAL
BY: MARK L. JOSEPHS, TRIAL ATTORNEY
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202)307-6288
Attorneys for the Defendant

DePAOLO-CROSBY REPORTING SERVICES, INC.
BUFFALO, NEW YORK 14202-2102

ALSO PRESENT: RICHARD A. MEDEMA, ESQ.,
Of Counsel
Drug Enforcement Administration
Office of Chief Counsel
700 Army-Navy Drive
Arlington, Virginia 22202
(Appearing via telephone)

A. There may have been, I don't recall. There's people in and out, agents in and out.
Q. Okay. And what was discussed at that meeting?
A. The first meeting was the penetration of the Cossack's Motorcycle Club and at the time I was riding a Harley and very much into it and I had been working with the Harley and bike gangs up in Canada and they just says, well, see what you can do and they would furnish me with money to see if I could make a buy, which comes up in this packet here.
I did one job for DEA and it panned out real good. I started supplying them with information as I went down buying parts from Cossack Motorcycle Club and just started hanging around with them and eventually infiltrated them.
Q. So at that meeting is it fair to say that the DEA was interested in you working undercover for them?
A. Yes.
Q. When you say that you would be paid, what exactly were you told at that meeting?
A. At first they were going to try and get the

OCDETF project off the ground. At that time I told them of an individual that I had, I knew he was going to be delivering drugs up in the Conrad, Montana, area, and in Montana, and I gave that information to Wes Hearon. He turned around and followed up on it and they ended up busting an individual in an S-10 Chevy pickup and they found a couple ounces of cocaine up in the headliner is what they did and they paid me for that $500.

Q. I'm just interested in that first meeting at the beginning of August.

A. Right.

Q. What were you told about what you would be paid?

A. Well, they would pay me until we can get the OCDETF project off the ground, they would pay me by each job once I started infiltrating and making buys. That's when they got a hold of Donald Young, I think it's Seattle, Washington, he's the one that set up the OCDETF case and then there was another meeting when I had to sign this cooperation agreement. I finally signed it and that's when we discussed they were going to give

me $2,000 salary of which a thousand would go towards my family to keep them and a thousand for me to work on the street with.

Q. Okay. At the first meeting do you remember anybody saying anything about what the terms of payment would be?

A. Well, it had been usually cash, cash and sign a voucher. Everything had to be with a voucher.

Q. Who exactly was the one talking about the payment?

A. Wes and Ben both, Wes Hearon and Ben Yarborough.

Q. Now, you talked about a second meeting?

A. The second meeting. Go ahead.

Q. What happened at the second meeting?

A. The second meeting is when they were pretty much satisfied and figured I could do something as far as getting this case going and that there's when we signed the cooperating agreement and we did the tape recording of the 2,000 salary, the 2,500 per indicted defendant directly related to me, 25 percent of any assets seized and relocation expenses.

Q. Okay. That second meeting, do you remember when

which was acting, working under Ben.
Q. I'm just asking about this specific meeting for now, though.
A. This specific meeting Ben Yarborough is the one that gave me what they would pay me.
Q. And did you -- well, during this second meeting was it discussed what you would be doing?
A. Yes.
Q. And what were those discussions?
A. My primary thing was to bring intelligence, look for drug buys, set up drug buys. They set up a drug house in town, DEA, they set up a house in town that we were to use for buys. We used it very, very little for the money that was put out for it because we did most of our buys right at the clubhouse and then at one point it was set up for us to go out West and we got $3,000 up front to buy drugs and we went out West and that was tape recorded the whole distance from Montana to Stagecoach, Nevada.
Q. What do you mean, tape record the whole distance?
A. I had a radar detector in my car that was actually a wire and all our conversation that's

A. You know, you're asking me to bring you intelligence on criminal activity.
Q. Okay. How about this, did anyone ever tell you that you couldn't participate in criminal activity as a person under investigation unless the DEA said you could?
A. Yes.
Q. Did you understand you were not an employee of the DEA?
A. I understood that.
Q. And that you were not an undercover agent of the DEA?
A. Exactly, I was a cooperating individual or as I was known up North as a hired gun when I was in front of judges on testimony.
Q. And did you understand that you had to keep your participation as a cooperating individual confidential?
MR. GUSTAFSON: I have been tolerating I guess a number of -- excuse me, what was that question?
MR. JOSEPHS: I was asking if he understood that he was to keep his participation with the

It does say half month's salary here, that may have been what they were giving me before we got the OCDETF thing straightened out because that started on 9/1/92.

This here was expenses for and information, fuel, oil, just general stuff to live on, buy beer. You go over and sit down with a bunch of bikers, drink some beer, try to set up some deals, try to make some money and that's how the gangs work, infiltrate them from 8/21 to 8/27.

On 9/1 I got paid a thousand dollars, half of September salary, pretty much even, two hundred bucks, information which was received from a trip that I went to Butte, Montana, a couple hundred, my trip, and I had to rent a motel room, had to be out all night and part of the day, all day out with them riding. I mean, I was doing a 24/7. It's not like some people quit and go home, I was there all the time.

Undercover trailer, 124 expenses, I don't know, I don't remember what the hell that was. Information and expenses, $200 partial salary for CI, that goes on top of the thousand. They gave

Q. And who told you that?
A. That would have been Ben -- Wes Hearon.
Q. Did you in fact testify at any time when acting as a cooperating individual of the DEA?
A. Yes, I went to Grand Jury.
Q. When was that?
A. January of -- that was expensive to go down there, too, DEA wouldn't even give me expense money to go to Billings so their voucher wouldn't be in here. What do you want to know, the dates of the Grand Jury? I don't remember.
Q. Just generally you said January, could it have been January '94?
A. Could have been, could have been.
Q. So you testified in the Grand Jury?
A. In Billings, Montana, I testified and I turned in evidence of our whole trip from Great Falls to Carson City and then onward to LA, which Goat took himself, him and a girl with him and I waited in Stagecoach, Nevada, at the Baron's Motorcycle Clubhouse for a period, then I stayed up in Carson, yes, Carson City with Wes Hearon, different motels but in the same city. It was

the only way they can keep me secure.
Q. So you testified in the Grand Jury once on one day?
A. One day.
Q. Were you asked to testify at the trial of Gary Lee Roberson?
A. Sure, it was Tiny, yes, sure was.
Q. And did you in fact testify?
A. No.
Q. Why not?
A. Well, seeing I've gotten screwed around by the DEA in the past on that same case, I asked them to send me a round-trip air ticket. They would not do it, they wouldn't give me no security, they wouldn't get me any security from the airport to a motel, they wanted me to fork this out of my pocket. I'm not going to do it, they never paid my moving expenses and why should I trust them.
Q. Where was the trial of Gary Lee Roberson?
A. It was in Great Falls, Montana, and I had made arrangements there to drive my own car there. I was served -- I wasn't served, it came in the

A. Truck.
Q. And marijuana. Did the DEA approve you carrying a gun or holding marijuana?
A. They didn't approve of a gun going out on a -- that was supposed to be a buy that night and I wasn't going to take my truck and instead of taking -- I had another individual from Montana, Montana Bureau of Narcotics investigation and instead we took mine at which time I forgot that stuff was even in there. I knew the gun was but I didn't think it would be a problem because it was locked up.
Q. What about the marijuana, did the DEA approve?
A. It wasn't legal, I know it was not legal but that's part of being around when you're eating and living 24/7, sometimes stuff like that gets left in your vehicle without you being aware of it.
Q. So again the DEA did not approve you having marijuana in the truck?
A. No, not in the truck.
MR. JOSEPHS: If I can just show you, I'm going to have the court reporter mark Plaintiff's

A. To come to Tiny's court appearance for possible retribution, I could say.
Q. And when was this death threat by Snider relayed to you?
A. How was it?
Q. When.
A. It was when I was still living in Conrad around the beginning of December of '92.
Q. You were interested in relocating to Ashland, Wisconsin; is that correct?
A. This is true.
Q. And you had a job lined up January 4, 1993?
A. Yes.
Q. As a mechanic in a Ford garage?
A. Yes.
Q. You didn't make it there; is that correct?
A. That was a trail of dust.
Q. Meaning what?
A. Meaning they told people where I go.
Q. Excuse me, did you go to Ashland, Wisconsin, and report for the job?
A. Yes, I did, and I ended up in Central Wisconsin with the same kind of job.

Q. Did you get any money to help relocate you to this area?
A. No, sir.
Q. When did you first start work out there in Wisconsin?
A. When I got there.
Q. Would that have been in January?
A. Yes.
Q. Would have been after the Grand Jury here on January 20?
A. Yes, much after, probably March.
Q. Okay. And from there you went to Fort Erie, Ontario?
A. Yes, sir.
Q. Is that correct?
A. Yes, sir.
Q. When would you have commenced residing there in Fort Erie?
A. Fort Erie, let's see, would have been December of '93.
Q. Okay. Now, this death threat that we made reference to, that would have been then sometime in December of '92; is that correct?

A. You're talking about up on top, it says, "payment for expenses and October salary."
Q. Right, and it's checked at the top is for information and expenses; is that correct?
A. Yes.
Q. Of what portion of this $2,000 that was paid to you under this voucher would have been expenses?
A. Well, probably half of it because half went to the family and half stayed for the road.
Q. And what half would be for expense?
A. A thousand dollars would be for expenses.
Q. And that's the half that you took on the road to cover your motel room, your gas and that sort of thing?
A. No, I used my own money for that, this particular, the end of October.
Q. What other money did you have other than the payments you received from the DEA? At this time that was your principal source of income, was it not?
A. Yeah, yeah, I got that $2,000 award.
Q. I'm talking about this voucher here, this $2,000 payment of expense and October salary.

A. I was still doing things with them, I was still in contact with the bike club.
Q. I understand. I'm asking if you can tell me what portion of the $2,000 was for the expense portion.
A. A thousand.
Q. If you know.
A. It would be a thousand, as usual.
Q. And that's the money that you used on the street, so to speak; is that correct?
A. That is correct, that's the proper -- that is correct.
Q. That would be for like gasoline, motel room, that sort of thing?
A. Yes.
Q. Now, you've reviewed a copy of your complaint filed in this action; is that correct?
A. Yes.
Q. And you did that in preparation for today's deposition?
A. Yes.
Q. So if I refer you to Page 4, the top of that complaint --