Q. And you gave them your Social Security number?
A. I gave them an assumed number.
Q. Okay. You gave them your birth date?
A. An assumed.
Q. Okay. What was the reason for fingerprinting, do you know?
A. They do that to everybody, fingerprints and picture.
Q. So they took your picture as well as your fingerprints; is that correct?
A. They sure did.
Q. Did they use these as preliminary or as part of their background check?
A. I imagine they did. They called London, Ontario, talked to one of the -- what do they call them up there -- investigators up there that had worked with me.
Q. Who is that, do you recall?
A. I don't remember his name.
Q. Okay. Now, you mentioned early in your testimony today that this agreement when it was signed August 3, 1992, that there was discussion about your compensation; is that correct?

A. Yes.
Q. And that compensation included $2,000 a month salary?
A. Yes.
Q. $2,500 per indicted defendant as a result of your intelligence information?
A. Yes.
Q. And 25 percent of any assets seized from any defendant so indicted?
A. Yes.
Q. And that also they were going to pay your relocation expenses at the conclusion of the investigation; is that correct?
A. Yes.
Q. And you indicate that this discussion of your compensation was done at the time or prior to your execution of this August 3, 1992 confidential agreement?
MR. JOSEPHS: Objection, vague.
Q. When did you sign this, after these compensation agreements were agreed upon or before?
A. No, it was signed afterwards.
Q. Right after the conversation had been discussed

and agreed upon?
A. Yes.
Q. Is that your answer?
A. Yes.
Q. Would you have signed that agreement if the compensation arrangements had not been ironed out and agreed upon?
A. No.
Q. And you indicated that these discussions leading up to your signature of this agreement had been tape recorded; is that correct?
A. I was aware of it being tape recorded.
Q. And what kind of tape recording was there? You said something about it being in plain view; is that correct?
A. Yes, in the middle of the table or end of the table, not middle of the table.
Q. And you were asked if it was all right if it would be recorded?
A. Yes.
Q. You gave your consent to that?
A. Yes.
Q. Did they have you sign any consent?

A. The only thing I signed was that cooperation of individual agreement.

Q. There are places for two witnesses signatures on there that are obliterated on this Exhibit 8 of the complaint, I think it's referred to as Defendant's Exhibit 1?

A. Yes.

Q. Do you know who witnessed that document, your signature?

A. To the best of my knowledge I believe it was Ben Yarborough and Wes Hearon.

Q. And they're representatives of the Drug Enforcement Administration?

A. Yes, sir.

Q. Now, you mentioned preliminary to this meeting which is apparently a second meeting with these folks; is that correct?

A. This is true.

Q. That a Donald Long or Donald Young from the Seattle regional office of the DEA was involved?

A. Yes.

Q. And did I understand you to say that he set up this OCDETF case?

A. That was the knowledge I was given through Wes Hearon.
Q. Did you ever talk to Donald Young personally?
A. I tried talking to him at one point at the end but I was referred back to Ben Yarborough, of course.
Q. Okay. What's the OCDETF, O-C-D-E-T-F, I believe, what do these refer to?
A. I have no idea, has something to do with organized crime is all I know probably within the motorcycle gangs.
Q. Was that a word that was commonly referred to or case reference that was referred to in connection with your undercover investigations?
A. Yes.
Q. And you had indicated in your discussions with these folks prior to you coming on board on August 3, 1992, that there had been some reference to some people with U.S. Customs; is that correct?
A. Yes.
Q. And had they -- they were somehow involved in an introductory fashion introducing you to the DEA

folks; is that correct?
A. That's correct.
Q. You mentioned two names, I believe a McKinnon and a Beauchard?
A. Mark Beauchamp.
Q. How do you spell that? You have his card there, I believe.
A. It's, B-e-a-u-c-h-a --
Q. Excuse me?
A. B-e-a-u-c-h-a-m-p.
Q. And he's with the U.S. Customs?
A. Yes.
Q. And where's he located, did you say?
A. Middleburg Heights, Ohio, is the last address I have on him.
Q. Middleburg Heights, is that one word?
A. Middleburg is one word.
Q. Heights, Ohio?
A. Correct.
Q. And then the other one is a McKinnon; is that correct?
A. Yes, but don't get that confused with the guy in what is it, Seattle, because there's one there,

too.
Q. Oh.
A. There's one in Customs.
Q. I'm talking about a U.S. Customs person.
A. Yes, he's at the Great Falls office or was.
Q. Okay. And were both these people physically present in Great Falls when this project was being set up?
A. One being Mark advised me about it and then the other one was present.
Q. McKinnon?
A. Yes.
Q. What was his first name again, do you recall?
A. For some reason I think it was Mark.
Q. Well, you have Mark Beauchamp?
A. Yeah, I know. I know there's a couple Marks involved, I couldn't say for sure.
Q. One of these people was there in the Great Falls area at the time, then?
A. Yes.
Q. And that would have been McKinnon?
A. Yes.
Q. Was he there on August 3, 1992?

A. No, he was there for the principle of introduced me, introducing me to begin with.
Q. That would have been maybe the meeting that preceded the second meeting?
A. Yes.
Q. Do you know --
A. Pardon?
Q. Do you understand the question?
A. I didn't hear what you said.
Q. Was McKinnon there at the initial meeting at these folks or the second meeting on August 3, 1992 when you signed the cooperating individual agreement?
A. He was with the first one.
Q. Now, moving up to the August 3, 1992 meeting, then, you testified Ben Yarborough was present; is that correct?
A. Yes.
Q. As well as Wes Hearon and his partner, Gale Williams?
A. Yes.
Q. All three representing the DEA; is that correct?
A. Uh-huh.

Q. Whose office did this take place in?
A. DEA Great Falls.
Q. Who was the resident agent in charge at Great Falls?
A. Ben Hearon.
Q. Excuse me, Ben --
A. Ben Yarborough, I'm sorry.
Q. So this meeting took place in his office; is that correct?
A. It took place in a -- not his office but a, what do you call this?
Q. Conference room?
A. Conference room, yeah.
Q. And his office was adjacent to the conference room?
A. Thereabouts.
Q. You said that after the meeting he took the tape out of the player, is that right, or the recorder?
A. Yes.
Q. And he took it to his office?
A. Yes.
Q. What kind of a tape are we talking about here, is

it a mini cassette, a micro cassette or standard?
A. Standard.
Q. Standard cassette?
A. Yes.
Q. Did he ever indicate or offer you a copy of that tape?
A. No.
Q. Did he indicate to you what he was going to do with that tape?
A. I just figured it as formality.
Q. Did he give you any reason for the tape recording or what he intended to do with it afterwards?
A. Just formality is the way I looked at it.
Q. What did he represent to you, what was his purpose for it or did he represent any purpose?
A. I don't remember any, it was just to me was standard procedure.
Q. Now, you said you indicated that there may have been several other folks there besides these three people with the DEA; Ben Yarborough, Wes Hearon and Gale Williams?
A. Maybe not with DEA but Great Falls PD.
Q. Greg Church and Brian Lockerbie?

A. Yes.
Q. Is there a possibility that an ATF person was there, would you say?
A. There's a very great possibility. Like I said, say, I'm kind of confused between the Mark and Jeff at ATF because it has been eight years and both of them did work that case with me.
Q. You're referring to Mark Weiser and Jeff Grogh?
A. Yes.
Q. They're ATF representatives in Great Falls or were at that time?
A. They were working out of Butte.
Q. But they were somehow involved in this OCDETF case from you?
A. I bought a gun from Goat.
Q. Goat or Grill?
A. I bought a gun from Goat Snider and it was turned over to ATF.
Q. Oh, I see. So it would have been one of these two people is what you're saying?
A. Right.
Q. And was that gun part of your undercover operation, the purchase of that gun or the

turning it over to ATF?
A. It was turned over to Gale Williams.
Q. And was it an illegal weapon or some kind or whatever the purpose of you buying it and turning it over to Gale Williams?
A. I asked them if they were interested, they said they were. They had their own reasons, I didn't have to ask what they were.
Q. What kind of a gun are we talking about?
A. That there I couldn't tell you, it was a small handgun.
Q. Okay. Do you know if it was an automatic or semi-automatic?
A. Seems like to me it was a semiautomatic.
Q. Now, you said that after this project was set up you mentioned that you were involved, your involvement was 24/7. Would you explain what you mean by that.
A. Twenty-four hours a day, seven days a week.
Q. And this would have been commenced right after your signature of this agreement on August 3?
A. Pretty much so.
Q. You were involved in setting up the trailer home

and the necessary surveillance equipment?
A. Yes.
Q. And you lived there, then, or spent your evenings there during the time at the trailer?
A. I spend some evenings there.
Q. Did you have a roommate?
A. No.
Q. Did Goat stay there with you or any of these people at the Cossack's Motorcycle Club?
A. Goat never stayed with me, he had been over there but he never stayed.
Q. Then if I understood correctly, you went to work, that's how you penetrated the circle of bikers; is that correct?
A. Yes.
Q. Who hired you?
A. Well, I wasn't hired per se, it was more like Goat was sponsoring me to join the club and it's like part of it, you have to go in there and work with them.
Q. When you say, "work," you mentioned a building or facility called Custom Motorcycle and Cars; is that right?

A. Yes.
Q. And those initials are CMC and it also stood for Cossack's Motorcycle Club?
A. Cossack's Motorcycle Club, yes.
Q. Right. Did it have the appearance of a legitimate business, CMC?
A. It had a bunch of cars and trucks outside; cars, trucks, motorcycles, inside parts.
Q. It had a parts inventory?
A. Yes.
Q. Repair shop?
A. Yes.
Q. Did you do repairs?
A. Yes.
Q. You worked on motor bikes and what have you?
A. Yes.
Q. And then following that you then also became a member or considered a member of the CMC, Cossack's Motorcycle Club?
A. I was not a member, I was what they call a prospect to be a member.
Q. But Michael Goat Snider was your sponsor?
A. Yes.